### Case No. 4,604.

### In re FAGAN.

[2 Spr. 91.][1]

[1] [Reported by John Lathrop, Esq., and here reprinted by permission.]

E. A. Alger, T. H. Sweetser, and Mr. Sanford, for petitioners.

Major-General Devens, pro se.

SPRAGUE, District Judge. These are writs of habeas corpus; several of them were issued on the 14th of this month; on one of them due return was made on the 15th, and on the others on the 16th, and the hearing on all was postponed to the 19th. The proclamation of the president of the United States, suspending the privilege of the writ of habeas corpus in certain cases, which was issued on the 15th, was not known here until the morning of the 16th. The respondent interposes that proclamation as an objection to further proceedings.

To this objection three answers have been made by the counsel for petitioners. First, that these writs were issued before the proclamation of the president, and for that reason are not subject to its operation; second, that the proclamation does not embrace cases like these; and, third, if it does, it is not warranted by the act of congress upon which it is founded.

I proceed to consider the sufficiency of these answers. It is contended by some of the counsel that the writs of habeas corpus having been actually issued before the proclamation, and the return of one of them having been made by the respondent on the day of the date of the proclamation,—perhaps before it was issued, certainly before it was known here,—it came too late to intercept the writs which had been previously taken out, and especially the one which was fully executed.

This argument confines itself to the legal process called the writ of habeas corpus, and insists that the process, having been served and returned, is functus officio, and of course cannot be prevented or suspended by the subsequent act of the president. This brings us to the inquiry, what it is that the proclamation suspends? Is it merely the process called the writ of habeas corpus, or is it the proceedings thereon,—the inquiry into the cause of detention and the granting relief by admitting to bail, granting a speedy trial or an immediate discharge, as law and justice may require? It is to be observed that the proclamation, using the language of the constitution, declares that the privilege of the writ of habeas corpus is suspended in certain cases. The constitution (article I), says that "the privilege of

the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it." What is the privilege intended to be thus secured? Is it merely the privilege of having the legal process or writ, technically called habeas corpus? or is it the privilege of having judicial inquiry made into the cause of imprisonment, and a discharge, if the detention be found to be unlawful? Suppose that congress, in time of peace, should enact that the courts of the United States should, upon application therefor, issue the writ of habeas corpus, and cause it to be executed by bringing the alleged prisoner before them, but should proceed no further; that they should make no inquiry, grant no relief, but leave the prisoner in the same custody as before,—would not the privilege, the benefit, of the writ of habeas corpus be taken away, although the process by which the benefit was intended to be practically obtained would remain untouched? Again, the constitution, in declaring that the privilege shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it, has in effect declared that in such cases the privilege may be suspended. Suppose that, in pursuance of this provision, the privilege had been suspended in certain cases, but the process generally not prohibited, and that a petitioner, ignorant of the true cause of the detention, alleges a different one, obtains the process, has the prisoner brought before the court, and then it is found that the real cause of detention constitutes a case in which the privilege of the writ has been suspended, can the court then proceed further and inquire whether such detention is legal, and order a discharge if it be not? Can the court properly say that although the privilege of the writ of habeas corpus has been constitutionally taken away for the time, yet they will grant all the relief, all the benefit, which they would if the privilege had not been taken away, merely because the process remained and had been executed? If so, then unless there be a universal prohibition of the writ, even in cases not affecting the public safety, it may be obtained and used as the means of bringing the prisoner before the court, and then the inquiry must proceed and relief be granted, to the same extent as if there had been no suspension of the privilege.

I have suggested cases in which the process might remain, although the privilege or benefit to be obtained thereby was taken away. May there not be cases in which the privilege will remain although that particular process is not allowed? For example, in Massachusetts, unless the imprisonment be by a sheriff, deputy-sheriff, coroner or jailer, the writ for bringing in the prisoner is not to be directed to the person having the custody, but to the sheriff, who is thereby commanded to take the body of the prisoner and have him before the court. Thus, what in law was always before known as a capias writ has in those cases been substituted for what has always been called habeas corpus. The process has been changed. Massachusetts in those cases has no technical writ of habeas corpus; and yet, have not her citizens the full enjoyment of the privilege of that writ? Have they not all the benefit which that writ was the means of securing? The change was not made to abrogate the privilege, but to render it more safe and certain. I am constrained to believe that if the president's proclamation has suspended the privilege of the writ of habeas corpus in the cases now before me, I ought not to proceed further, being precluded from granting the privilege, benefit, or relief which they ask.

This brings us to the second question; that is, does the proclamation embrace the cases now before us? After referring to the statute authorizing the suspension of the privilege, the proclamation declares that "in the judgment of the president, the public safety does require that the privilege of said writ shall now be suspended throughout the United States, in the cases where, by the authority of the president of the United States, military, naval, and civil officers of the United States, or any of them, hold persons under their command, or in their custody, either as prisoners of war, spies, or aiders or abettors of the enemy, or officers or soldiers or seamen, enrolled, drafted, or mustered or enlisted in, or belonging to, the land or naval forces of the United States, or as deserters therefrom."

It appears by the petition and the return of the respondent, in each of these cases, that these prisoners are all, in fact, held by a military officer as soldiers drafted or enlisted into the service of the United States; and it is not controverted that such is the real cause of detention. But it is insisted that they are not legally held, because the two who were drafted were not liable to enrolment, and the three who enlisted are minors, having parents who did not consent thereto. By the terms of the proclamation, the privilege of the writ is suspended in cases where military officers hold persons under their command, or in their custody as soldiers drafted, mustered, or enlisted, &c. It is insisted that by this description those only are meant who are legally held as soldiers, drafted or enlisted, and that it cannot mean those who are illegally and wrongfully held, and therefore, that the court in order to determine whether they come within the meaning of the proclamation, must inquire and ascertain whether they are legally detained, and, if they are not, then the proclamation does not reach them and they must be discharged. If this be so, it is difficult to see how the proclamation is to have any effect whatever, for the proceedings must be the same as if the proclamation had never been issued. The

question whether the prisoner be legally held or not, is of course to be determined by the court or judge. Prior to the proclamation, the course was this: if the petition showed on its face that the party was legally imprisoned, no writ was granted, because it would be useless. If the petition set forth an illegal imprisonment or restraint, then the writ was granted, the party brought up, and the cause of detention inquired into. If found to be legal, he was remanded: if found not to be legal, he was discharged. Now, upon the construction of the proclamation contended for, the course must still be the same. Under it the writ must be refused or granted, according as the petition sets forth a legal or illegal imprisonment; and when granted, the court must inquire into the cause of imprisonment, and, if found to be legal, must remand the prisoner, and, if otherwise, must discharge him. By this construction, the proclamation suspends the privilege as to those soldiers only who are legally held. But what privilege of the writ had such soldiers which could be taken away or suspended? They had no right to be discharged, or to any relief from their restraint; they had no right even to the process, for, if the true character of their detention appeared on the petition, the writ would be rightfully refused.

It is not reasonable to suppose that it was intended to suspend the privilege as to that class of soldiers only, who, without such suspension, would have had no right to the writ, and could derive no benefit therefrom; who, indeed, had no privilege to be suspended. I think that in cases like these now before me, where persons are held as soldiers by a military officer, the proclamation intended to take from them for the time the privilege of having the legality of their detention inquired into, and relief granted by means of the writ of habeas corpus.

It is in the next place contended that if such be the true construction of the proclamation, it is not authorized by the statute of the 3d of March, 1863, upon which it is founded. That statute begins as follows: "That during the present Rebellion, the president of the United States, whenever in his judgment the public safety may require it, is authorized to suspend the privilege of the writ of habeas corpus in any case throughout the United States, or any part thereof."

The president is thus authorized to suspend the privilege in any case throughout the United States. No case is excepted. Not one is withheld from the operation of this power. All come within its scope, and the cases now before me are clearly comprehended in this language. But it is urged that this comprehensive and unrestricted language is limited by what follows, which is in these words: "And whenever and wherever the said privilege shall be suspended, as aforesaid, no military or other officer shall be compelled, in answer to any writ of habeas corpus, to re-

turn the body of any person or persons detained by him by authority of the president; but upon the certificate, under oath, of the officer having charge of any one so detained, that such person is detained by him as a prisoner under authority of the president, further proceedings under the writ of habeas corpus shall be suspended by the judge or court having issued the said writ." It is assumed in the argument for the petitioner that this provision extends only to persons in confinement by special authority of the president, as state or political prisoners, and that it does not embrace those held under the ordinary or usual operation of any code or system, civil or military.

Without pausing to inquire whether this assumption be well founded, I will, for the present at least, consider it to be so, and that the special provision in this clause of the statute embraces only one class of cases. What is this special provision? It is that, when the privilege is suspended as to such prisoners, the officers by whom they are detained shall not be compelled to return their bodies, in answer to any writ of habeas corpus, and that upon making a certificate, upon oath, that they are detained as prisoners by authority of the president, the court shall proceed no further. Here two things are enjoined in this class of cases. The officer is not to be compelled to produce the body, and his certificate, under oath, of the cause of detention is to be conclusive. Does the circumstance that this special provision extends only to those cases, prove that no other were contemplated in the previous clause of the statute, and that the generality of its language should be restrained and limited to the single class to which the subsequent clause is applicable? Is such a deduction legitimate? The writ of habeas corpus had long been in frequent use, in a great variety of cases. One class was under the Civil Code, when persons were held by color of legal process, or as infants or lunatics, or otherwise. Another class consisted of persons detained under military authority as soldiers or prisoners of war, or spies, or as having committed some offence subjecting them to military restraint. The writ of habeas corpus is unquestionably applicable to all these cases, and had long been actually and frequently used therein. This must have been well known to the members of congress; and when they declared in this statute, that the president should be authorized to suspend the privilege in any case throughout the United States, they were well aware that each and all of these cases were embraced in that language. Indeed, one of the classes, which I have just referred to, must have been especially present to their minds in connection with this very matter of the suspension of the privilege.

Several instances had previously occurred in which writs of habeas corpus had commanded officers to return the body of a sol-

dier, and obedience thereto had been refused. One such case, in particular, is now in my recollection. It was early in 1861, in the city of Washington. An officer of the army having refused to bring up a soldier in obedience to a writ of habeas corpus, which had been granted by a court of the United States, the judges of that court severally delivered opinions insisting emphatically upon the legal authority of the court, and one or more of them animadverted in terms of much indignation upon the refusal of the officer. These proceedings and opinions were published in the newspapers, and were of general notoriety. The refusal to obey the writ was by a subordinate officer in the city of Washington, and under the eye of the president himself. Congress must have been aware that the president claimed and was disposed to exercise the right to suspend the privilege in the very class of cases now before me; and yet, in declaring what authority the president should have to suspend the privilege, they used language clearly embracing this class.

That language is to be understood and carried into effect according to its fair import, unless there be something in the subsequent portion of the statute inconsistent therewith. Is there any thing? The terms of the first clause, as we have seen, comprehend three classes of cases. One is, where persons are held in restraint under the ordinary administration or operation of the military code or system. Another is, where persons are held under the ordinary operation or working of the civil code or system: the term "civil" being used in contradistinction to "military." In the practical working of both these systems, it sometimes occurs, either by mistake or design, that persons are wrongfully held in confinement, and seek relief by the writ of habeas corpus. The third class is, where persons are held through the extraordinary interposition of the president and by his especial authority. As to such persons, the second clause of the statute has made a special provision in case of a suspension of the privilege relieving the officer from all obligation to return the body, and making his certificate conclusive. But the existence of this special provision can in no way interfere with the suspension of the privilege in other cases, but they are left to the operation of the suspension just as if that special provision had never been made.

In the ordinary course of procedure, some facts must exist to bring the prisoner within the class of persons as to whom the privilege is suspended, and such facts must be set forth in the return of the officer, and may be contested; and during the contestation, the court will require that the prisoner shall be within its control and brought up for that purpose. For example, if the proclamation had suspended the privilege in the case of persons held as soldiers, and who had been so held for the term of three months, then the officer's return must have set forth both those facts, and both might have been contested. By the present proclamation only one of these facts is required, namely, that he is held as a soldier; but that may be controverted, and we may imagine a case in which this might be done with success. It may be made to appear, for instance, that a person held in restraint by the officer is a child of tender years, and that the return of the officer that he is held as a soldier is a false pretence. Such is the course of procedure in ordinary cases. But, in the extraordinary case of persons held by the special authority of the president, the legislature has declared that the certificate of the officer shall be conclusive, and that he shall not be compelled to produce the prisoner. It is not necessary that we should fathom the reasons for this peculiar provision. But it may be remarked that congress, with respect to political prisoners, appear to have thought it best that the courts shall not have any custody of the body, or try any question upon habeas corpus, but leave them to seek relief by some other procedure. And by the same statute congress has provided another mode of relief as to all such prisoners who are "citizens of states in which the administration of the laws has continued unimpaired in the said federal courts."

But whatever may be the reason, the truth is, that if we assume that the second clause in the statute extends only to political prisoners, or those held by special authority of the president, it is plain that congress has made a difference between the mode of procedure in that class and all other cases, and we must be governed thereby.

One thing further. The argument for the petitioners rests wholly upon the ground, that the second clause was intended to be co-extensive with the first, and that it is necessary to give it such a construction as will make them both embrace only the same cases. If this were so, then the result, I apprehend, would not be to contract the language of the first clause, but to extend the second so as to make it applicable to all the cases within the terms of the first. The language in the second clause is "persons detained by authority of the president," and again a "person detained as a prisoner under authority of the president." Now it might be contended that persons held by a subordinate officer are held by authority of his commander-in-chief, and that a person restrained of his liberty is imprisoned. And it would be more reasonable to adopt this construction, than it would to contract the first clause to a single class of cases which could not be done by any construction; but only by doing violence to its plain and inflexible language. I do not dwell upon this, because I do not see the necessity of making the two classes co-extensive.

I am brought to the conclusion that the objections which have been made to the appli-

cation of the proclamation to these cases cannot prevail, and that I am precluded from proceeding further in this inquiry.

If these parties or any of them are entitled to relief, they must seek it from the officers or tribunals which are authorized to afford it.